NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-172

SHOP RITE, INC., ET AL.

VERSUS

SHAWNE GIELEN GARDINER

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 201910957
HONORABLE LAURIE A. HULIN, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

CANDYCE G. PERRET
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, John E. Conery, Van H. Kyzar, Candyce G. Perret, and Sharon Darville Wilson, Judges.

Pickett, J., dissents and assigns reasons.
Conery, J., dissents for reasons assigned by Judge Pickett and for additional reasons assigned.

**AFFIRMED.**

**Steven G. Durio**
**Lauren Noel Maurer**
**Durio, McGoffin, Stagg & Ackermann**
**Post Office Box 51308**
**Lafayette,   LA 70505-1308**
**(337) 233-0300**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Shawne Gielen Gardiner**

**Christopher L. Zaunbrecher**
**Briney Foret Corry, LLP**
**Post Office Box 51367**
**Lafayette, LA   70527-1367**
**(337) 237-4070**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Tobacco Plus, Inc.**
    **Shop Rite, Inc.**
    **Acadia Wholesale & Tobacco, Co., Inc.**

**PERRET, Judge.**

Appellant/plaintiff-in-reconvention, Shawne Gielen Gardiner ("Ms. Gardiner"), seeks review of a trial court judgment that sustained Appellees/defendants'-in-reconvention, Shop Rite, Inc., Tobacco Plus, Inc., and Acadia Wholesale & Tobacco Co., Inc., exception of no right of action, which dismissed Ms. Gardiner's claim for the fair value of shares that she inherited from her father. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On February 28, 2012, Ms. Gardiner's father, John Dan Gielen, donated a minority interest in Shop Rite, Inc., Tobacco Plus, Inc., and Acadia Wholesale & Tobacco Co., Inc. (collectively, "the Companies") to his children (Ms. Gardiner, Tracy Gielen, and Heidi Gielen Viator) and to a grandson (John Cody Gielen).[1] After Mr. Gielen's death on February 14, 2018, his spouse, Peggy Gielen ("Peggy"), became the owner of half of the majority shares in the Companies and was testamentary usufructuary with right of alienation of the other half of the community shares, also referred to by the parties as legacy shares. Mr. Gielen's Last Will and Testament dispensed with "any inventory of the property subject to the usufruct or any bond or security for the value of the usufruct[,]" and granted Peggy, "as usufructuary, with respect to all property subject to the aforementioned usufructs, the right to sell, exchange, or otherwise dispose of such property, without the consent of the naked owners, throughout the term of the usufruct." These legacy shares were subject to testamentary legacies of naked ownership in favor of the Gielens' children and grandson. On February 21, 2018, Peggy transferred all of her owned shares and

---

[1] The parties do not dispute that Mr. Gielen donated the following shares to his children and grandson: 39.216 shares in Shop Rite, 1.292 shares in Tobacco Plus, and 19 shares in Acadia Wholesale.

all of the estate shares in the Companies to voting trusts and named her grandson, John Cody Gielen ("John Cody"), the trustee.

On July 23, 2018, Ms. Gardiner gave written notice of her withdrawal as a minority shareholder in the Companies on grounds of oppression pursuant to the provision of La.R.S. 12:1-1435, which constituted an offer to sell to the Companies all of her shares in the corporations for fair value. On July 25, 2018, the Companies received the notice of withdrawal.

On September 21, 2019, the Companies responded to Ms. Gardiner's notice by denying that she was an oppressed shareholder and gave her notice of the Companies' acceptance of her offer to sell her shares in accordance with La.R.S. 12:1-1435.

On October 22, 2019, the Companies filed a Petition for Declaratory Judgment to determine the fair value of Ms. Gardiner's shares and the terms under which her shares would be purchased by the Companies. Specifically, the petition provided as follows, in pertinent part:

> 5. On July 23, 2018, Defendant, Shawne Gardiner, a minority shareholder in Tobacco Plus, Inc., Shop Rite, Inc., and Acadia Wholesale Tobacco Co., Inc., gave written notice to Petitioners of Gardiner's withdrawal as a shareholder in all three Companies, ostensibly on grounds of "oppression" pursuant to the provision of La.R.S. 12:1-1435, *et seq*.
>
> 6. In the letter of withdrawal Gardiner further notified Companies of her offer to sell all of her shares in the three corporations for fair value.
>
> 7. By law Gardiner's notice of withdrawal constituted an offer to sell to Companies the entirety of the shareholder's shares in the corporation at fair value, which offer was irrevocable for sixty days, La. R.S. 1:1435 (D).
>
> 8. On September 21, 2019, Companies responded to Gardiner, denying that the Defendant is an "oppressed shareholder" within the meaning of La. R.S. 12:1-1435, or under any other rational definition of that term.

2

9. Petitioners affirmatively aver Gardiner is not an oppressed shareholder within the meaning of §1-1435. At all times relevant to this proceeding the Corporations' conduct, governance and practices with respect to Gardiner was proper, had the approval of all other shareholders and directors, and demonstrated at all times a genuine effort to deal fairly and in good faith with all shareholders including Gardiner.

10. Nevertheless, on September 21, 2019[,] Shop Rite, Tobacco Plus, and Acadia Wholesale gave Gardiner notice in accordance with La.R.S. 12:1-1435E of the Companies' acceptance of Gardiner's offer to sell all interests she may have in shares in the Companies, subject to compliance with applicable provisions of the Companies' articles, bylaws, and loan agreements, including any restrictions, covenants and approvals which may apply to such transaction under existing corporate governance documents and loan agreements.

11. Because Gardiner's offer to sell did not specify a price for the shares, the Corporations and shareholder had sixty days from the effective date of the notice of acceptance to negotiate the fair value of the shareholder's shares and the terms under which the corporation is to purchase the shares. La.R.S. 12-1:1436.A(1).

12. On November 2, 2018, Petitioners made a good faith offer to purchase Gardiner's shares for a certain price, and subject to reasonable terms and conditions, stated in the offer and [in] compliance with applicable provisions of the Companies' governance documents.

13. As of the date of this Petition, Companies have not received a response to the offer nor any indication of interest by Gardiner in attempting to negotiate the price and the terms under which Companies will purchase the shares.

14. Under authority of La.R.S. 12-1:1436.A[,] Petitioners are entitled to declaratory judgment determining the fair value of the shares registered in the name of Gardiner and ordering the defendant to convey the shares to Companies, under such terms and conditions as the Court may deem appropriate.

15. Under authority of La.R.S. 12-1:1436.C[,] the Court shall conduct the trial of this matter by summary proceeding.

On October 29, 2019, Ms. Gardiner answered the Companies' petition and filed a reconventional demand pursuant to La.R.S. 12:1-1436 in order for the court to determine the fair value of her shares and to determine the terms for the purchase of the shares. In her reconventional demand, Ms. Gardiner alleges, in pertinent part:

2.

GARDINER is a shareholder of the COMPANIES. Before her father's passing on February 14, 2018, her ownership interest in each was as follows:

A. 39.216 shares in SHOP RITE, INC.;

B. 1.292 shares in TOBACCO PLUS, INC.; and

C. 19 shares in ACADIA WHOLESALE & TOBACCO CO., INC.

3.

In addition, since her father's passing on February 14, 2018, GARDINER is the naked owner of the following shares from her father's estate:

A. 79.49 shares in SHOP RITE, INC.;

B. 3.4425 shares in TOBACCO PLUS, INC.; and

C. 50.625 shares in ACADIA WHOLESALE & TOBACCO CO., INC.

. . . .

6.

By letter of July 23, 2018, Gardiner made demand upon SHOP RITE, TOBACCO PLUS and ACADIA WHOLESALE to withdraw from each corporate entity as an oppressed shareholder within the meaning of La.R.S. 12:1-1435.

. . . .

8.

By letter dated September 21, 2018, SHOP RITE, TOBACCO PLUS and ACADIA WHOLESALE elected and gave notice in accordance with La.R.S. 12:1-1435E of their acceptance of Ms. GARDINER'S offer to sell for fair value all interest she may have in shares of the Companies as an oppressed shareholder.

9.

Pursuant to La.R.S. 12:1436, once Defendants-in Reconvention agreed to buy GARDINER out at fair value, the parties had sixty (60) days to negotiate the fair value of GARDINER'S shares and the terms

4

upon which the Defendants-in-Reconvention corporations would purchase GARDINER'S shares.

In response to the reconventional demand, the Companies filed an answer on November 13, 2019, wherein they admitted that Ms. Gardiner was the record owner of 39.216 shares in Shop Rite, Inc., 1.292 shares in Tobacco Plus, Inc., and 19 shares in Acadia Wholesale & Tobacco Co., Inc., but denied the fact that Ms. Gardiner is the naked owner of the inherited 79.49 shares in Shop Rite, Inc., 3.4425 shares in Tobacco Plus, Inc., and 50.625 shares in Acadia Wholesale & Tobacco Co. Specifically, the Companies allege that the shares that were subject to a testamentary legacy of naked ownership in favor of Ms. Gardiner were transferred by Ms. Gardiner's mother, Peggy (usufructuary with the right of disposition), to voting trusts and were subsequently redeemed by the Companies.

On July 2, 2020, the Companies filed a Peremptory Exception of No Right Of Action arguing that Ms. Gardiner has no right of action to request for the trial court to determine the fair value and terms for the purchase of shares she inherited in her father's estate, which entailed the 79.49 shares in Shop Rite, Inc., 3.4425 shares in Tobacco Plus, Inc., and 50.625 shares in Acadia Wholesale & Tobacco Co., Inc. The Companies argued that Ms. Gardiner did not own the legacy shares on the date of the withdrawal and that she had no capacity or right to sell them on the date of the withdrawal. The Companies allege that her interest in the legacy shares terminated "on February 21, 2018, when the testamentary usufructuary with right of alienation transferred ownership of the shares to a Voting Trust, or in any event no later than April 17, 2019[,] when the shares previously subject to naked ownership interest in favor of Ms. Gardiner were redeemed by the Company." The Companies argue that "[a]s a consequence of the transfer of the estate shares to a third party, [Ms.] Gardiner has no claim or right of action as a former naked owner except a potential, inchoate

5

future action against the usufructuary for an accounting upon termination of the usufruct."

On July 9, 2020, Ms. Gardiner filed an opposition to the exception of no right of action wherein she alleges that she acquired naked ownership of the legacy shares immediately at her father's death, subject to a usufruct in favor of her mother, Peggy. Ms. Gardiner argues that, as the naked owner, she retains a beneficial interest in the legacy shares despite the shares being registered on the records of the corporation in the name of the usufructuary or in the voting trusts with John Cody as the trustee.

A hearing on the exception was held on July 14, 2021. At that time, the Companies introduced, under seal, thirty-eight exhibits that included copies of Mr. Gielen's Last Will and Testament, the Voting Trust Agreements, Amendments, Trust Deposits and Assignments of Shares, Stock Redemption Agreements, and Stock Transfers and Assignments. After the hearing, the trial court signed a judgment on September 3, 2020, that sustained, in part, the no right of action. The trial court provided the following pertinent reasons for its ruling sustaining the exception:

> Defendants in Reconvention, Shop Rite Inc., Tobacco Plus, Inc., and Acadia Wholesale and Tobacco Co. Inc. except to the reconventional demand filed by Gardiner, to the extent that Gardiner asks the court to determine the fair value and terms for the purchase for shares described in paragraph 3 of the reconventional demand. The basis for the exception is that Gardiner has no right of action. Mover argues that any interest Gardiner may have in those shares as a legatee of naked ownership terminated on February 21, 2018, when the testamentary usufructuary, with right of alienation, transferred ownership of the shares to a voting trust. In any event, ownership terminated no later than April 17, 2019, when the shares previously subject to naked ownership interest in favor of Gardiner were redeemed by the company. Plaintiff in reconvention opposes the exception arguing that Gardiner holds an interest in the legacy shares and the defendants in reconvention are judicially estopped from claiming otherwise.
>
> . . . .

6

After review of the law, evidence and argument of counsel, this court finds from February 21, 2018 until April 17, 2019, the beneficial owners of the estate shares were the Voting Trust and Peggy A. Gielen. On April 17, 2019, these shares were redeemed by the companies. Gardiner cannot sell or offer to sell the estate shares for fair value. This court finds Ms. Gardiner does not have the right of action against the defendant in reconvention to seek a judicial determination of the fair value and terms for purchase for shares in which Gardiner previously had an interest as a testamentary legatee of naked ownership. The Peremptory Exception is sustained.

The Reconventional demand in part is dismissed.

Ms. Gardiner now appeals this judgment alleging the following sole assignment of error: "The trial court erred in sustaining Plaintiffs' exception of no right of action and dismissing Gardiner's claims for fair value of her naked ownership interest in the Legacy Shares."

## STANDARD OF REVIEW

The standard of review of a ruling on an exception of no right of action, which presents a question of law, is de novo. *Washington Mut. Bank v. Monticello*, 07-1018 (La.App. 3 Cir. 2/6/08), 976 So.2d 251, *writ denied*, 08-530 (La. 4/25/08), 978 So.2d 369. "Appellate review of questions of law is simply a review of whether the lower court was legally correct or legally incorrect." *Foster v. ConAgra Poultry Co.*, 95-793, p. 2 (La.App. 3 Cir. 2/14/96), 670 So.2d 471, 473, *writ denied*, 96-645 (La. 4/26/96), 672 So.2d 674.

## APPLICABLE LEGAL PRINCIPLES

*No Right of Action:*

Louisiana Code of Civil Procedure Article 681 provides that "an action can be brought only by a person having a real and actual interest which he asserts." A peremptory "exception of no right of action is a threshold procedural device used to terminate a suit brought by a person who has no legally recognized right to enforce the right asserted." *Joseph v. Hosp. Serv. Dist. No. 2 of Parish of St. Mary*, 05-2364,

p. 4 (La. 10/15/06), 939 So.2d 1206, 1210. Thus, the "exception of no right of action serves to question whether the plaintiff in the particular case is a member of the class of persons that has a legal interest in the subject matter of the litigation." *Badeaux v. SW Computer Bureau, Inc.*, 05-0612 pp. 6-7 (La. 3/17/06), 929 So.2d 1211, 1217.

***Usufructs and Rights of the Usufructuary:***

Louisiana Civil Code Article 535 provides that a "[u]sufruct is a real right of limited duration on the property of another. The features of the right vary with the nature of the things subject to it as consumables or nonconsumables." According to La.Civ.Code art. 537 (emphasis added), "[n]onconsumable things are those that may be enjoyed without alteration of their substance, although their substance may be diminished or deteriorated naturally by time or by the use to which they are applied, such as lands, houses, **shares of stock**, animals, furniture, and vehicles." Louisiana Civil Code Article 539 provides that a usufruct of nonconsumables is a real right and specifically states as follows:

> If the things subject to the usufruct are nonconsumables, the usufructuary has the right to possess them and to derive the utility, profits, and advantages that they may produce, under the obligation of preserving their substance.
>
> He is bound to use them as a prudent administrator and to deliver them to the naked owner at the termination of the usufruct.

Louisiana Civil Code Article 550 further provides that "[t]he usufructuary is entitled to the fruits of the thing subject to usufruct[,]" and La.Civ.Code art. 553 provides that "[t]he usufructuary has the right to vote shares of stock in corporations and to vote or exercise similar rights with respect to interests in other juridical persons, unless otherwise provided."

Louisiana Civil Code Article 568 also discusses a usufructuary's rights to nonconsumable things and provides:

The usufructuary may not dispose of nonconsumable things unless the right to do so has been expressly granted to him. Nevertheless, he may dispose of corporeal movables that are gradually and substantially impaired by use, wear, or decay, such as equipment, appliances, and vehicles, provided that he acts as a prudent administrator.

The right to dispose of a nonconsumable thing includes the rights to lease, alienate, and encumber the thing. It does not include the right to alienate by donation inter vivos, unless that right is expressly granted.

Louisiana Civil Code Article 568.1 discusses a usufructuary's right to donate and alienate property and states, as follows:

If a thing subject to the usufruct is donated inter vivos by the usufructuary, he is obligated to pay to the naked owner at the termination of the usufruct the value of the thing as of the time of the donation. If a thing subject to the usufruct is otherwise alienated by the usufructuary, the usufruct attaches to any money or other property received by the usufructuary. The property received shall be classified as consumable or nonconsumable in accordance with the provisions of this Title, and the usufruct shall be governed by those provisions subject to the terms of the act establishing the original usufruct. If, at the time of the alienation, the value of the property received by the usufructuary is less than the value of the thing alienated, the usufructuary is bound to pay the difference to the naked owner at the termination of the usufruct.

According to La.Civ.Code art. 628, "[u]pon termination of a usufruct of nonconsumables for a cause other than total and permanent destruction of the property, full ownership is restored. The usufructuary or his heirs are bound to deliver the property to the owner with its accessories and fruits produced since the termination of the usufruct." Louisiana Civil Code Article 628 further states, "[i]f property has been lost or deteriorated through the fault of the usufructuary, the owner is entitled to the value the property otherwise would have had at the termination of the usufruct."

9

*The Business Corporation Act:*

Louisiana Revised Statutes 12:1-1435 governs the procedure affording an oppressed shareholder the right to withdraw from a corporation and states, in pertinent part:

> A. If a corporation engages in oppression of a shareholder, the shareholder may withdraw from the corporation and require the corporation to buy all of the shareholder's shares at their fair value.
>
> . . . .
>
> C. (1) The term "fair value" has the same meaning in this Section and in R.S. 12:1-1436 as it does in R.S. 12:1-1301(4) concerning appraisal rights, except that the value of a withdrawing shareholder's shares is to be determined as of the effective date of the notice of withdrawal pursuant to Subsection D of this Section.
>
> (2) The context of the transaction requiring appraisal, as described in R.S. 12:1-1301(4), is a sale of the entire corporation in an arm's-length transaction by a person who owns all of the shares in the corporation.
>
> D. A shareholder may assert a right to withdraw under this Section by giving written notice to the corporation that the shareholder is withdrawing from the corporation on grounds of oppression. When the notice becomes effective it operates as an offer by the shareholder, irrevocable for sixty days, to sell to the corporation at fair value the entirety of the shareholder's shares in the corporation. The notice need not specify the price that the withdrawing shareholder proposes as the fair value of the shares, but if the notice does specify a price, the price shall be part of the offer to sell made by the shareholder.
>
> E. The corporation may accept the offer to sell made in the shareholder's notice of withdrawal by giving the withdrawing shareholder written notice of its acceptance during the sixty days that the offer is irrevocable. If the shareholder's notice of withdrawal specifies a price for the shares, the corporation's notice of acceptance operates as an acceptance of both the offer to sell and the proposed price unless the notice states that the corporation is accepting the offer to sell, but not the price; in that case the notice of acceptance operates only as an acceptance of the shareholder's offer to sell the shares at their fair value. The corporation's acceptance of the shareholder's offer does not operate as an admission or as evidence that the corporation has engaged in oppression of the shareholder.

10

Louisiana Revised Statutes 12:1-730 governs voting trusts and provides, as follows:

A. One or more shareholders may create a voting trust, conferring on a trustee the right to vote or otherwise act for them, by signing an agreement setting out the provisions of the trust, which may include anything consistent with its purpose, and transferring their shares to the trustee. When a voting trust agreement is signed, the trustee shall prepare a list of the names and addresses of all voting trust beneficial owners, together with the number and class of shares each transferred to the trust, and deliver copies of the list and agreement to the corporation's principal office.

B. A voting trust becomes effective on the date the first shares subject to the trust are registered in the trustee's name.

C. Limits, if any, on the duration of a voting trust shall be as set forth in the voting trust. The duration of a voting trust that became effective before January 1, 2015, may not exceed fifteen years, but may stipulate that it may be extended under the same terms and conditions for an additional period not to exceed ten years from the date of the expiration of the initial term. The limitation imposed by this Subsection on the duration of a voting trust that became effective before January 1, 2015, may be modified or eliminated by unanimous agreement of the parties to the voting trust.

Louisiana Revised Statutes 12:1-140 sets forth the definitions of general terms used in the Louisiana Business Corporation Law, some of which are pertinent to the issues in this appeal:

(2A) "Beneficial shareholder" means a person who owns the beneficial interest in shares, including a record shareholder or a person on whose behalf shares are registered in the name of an intermediary or nominee.

. . . .

(19A) "Record shareholder" means either of the following:

(a) The person in whose name shares are registered in the records of the corporation.

(b) The person identified as the beneficial owner of shares in a beneficial ownership certificate pursuant to R.S. 12:1-723 on file with the corporation to the extent of the rights granted by such certificate.

. . . .

11

(21) "Shareholder" means . . . a record shareholder.

Louisiana Revised Statutes 12:1-723 governs procedures for a corporate board of directors to permit a person whose shares are registered in the name of another to file a beneficial ownership certificate electing to be treated by the corporation as the record shareholder and states as follows:

A. A corporation's board of directors may establish a procedure under which a person on whose behalf shares are registered in the name of an intermediary or nominee may elect to be treated by the corporation as the record shareholder by filing with the corporation a beneficial ownership certificate. The extent, terms, conditions, and limitations of this treatment shall be specified in the procedure. To the extent such person is treated under such procedure as having rights or privileges that the record shareholder otherwise would have, the record shareholder shall not have those rights or privileges.

B. The procedure shall specify all of the following information:

(1) The types of intermediaries or nominees to which it applies.

(2) The rights or privileges that the corporation recognizes in a person with respect to whom a beneficial ownership certificate is filed.

(3) The manner in which the procedure is selected, which shall include that the beneficial ownership certificate be signed or assented to by or on behalf of the record shareholder and the person or persons on whose behalf the shares are held.

(4) The information that must be provided when the procedure is selected.

(5) The period for which selection of the procedure is effective.

(6) The requirements for notice to the corporation with respect to the arrangement.

(7) The form and contents of the beneficial ownership certificate.

C. The procedure may specify any other aspects of the rights and duties created by the filing of a beneficial ownership certificate.

## DISCUSSION

The issue before this court is whether Ms. Gardiner has a right of action against the Companies under the oppressed shareholder statute, La.R.S. 12:1-1435,

to recover the value of the shares she inherited from her father on February 14, 2018, at the time of her withdrawal as a minority shareholder on July 23, 2018. Ms. Gardiner argues that she is a beneficial shareholder of the Companies because she is a person who owns the beneficial interest in the legacy shares, namely her naked ownership.

The parties do not dispute that Peggy, as the usufructuary of the legacy shares, had the right to vote the legacy shares and to receive the dividends and distributions attributable to the legacy shares after her husband's death on February 14, 2018. Additionally, Mr. Gielen's Last Will and Testament granted Peggy "as [the] usufructuary . . . the right to sell, exchange, or otherwise dispose of such [usufruct] property, without the consent of the naked owners, throughout the term of the usufruct." Although La.Civ.Code art. 568 states that a "usufructuary may not dispose of nonconsumable things" this same codal article provides for this right if in fact the parties expressly request it. As stated in La.Civ.Code art. 568: "The usufructuary may not dispose of nonconsumable things, unless the right to do so has been expressly granted to him." The 1976 Revision Comment (a) to article 568 further states that "the grantor may expressly grant to the usufructuary the right to dispose of nonconsumable things subject to the usufruct, in which case the usufruct of nonconsumables may be converted into a usufruct of consumables at the option of the usufructuary." Because this right to dispose of nonconsumable things was expressly provided for in Mr. Gielen's Will, it is controlling over the general Civil Code articles on usufructs. Accordingly, the Last Will and Testament provided Peggy with the right to dispose of the shares of stock in any way she chose to do so without the input from the naked owners.

The record provides that on February 21, 2018, shortly after her husband's death, Peggy transferred all of her owned shares as well as the legacy shares (Mr.

Gielen was the record owner of the legacy shares) in the Companies to voting trusts and named her grandson, John Cody, the trustee. When Peggy transferred the legacy shares to the voting trusts, the legacy shares were cancelled and replaced with trust shares. The Voting Trust Agreements provided for the deposit of certificates representing the shares owned by and/or subject to the usufruct of Peggy, endorsed in blank by Peggy or accompanied by a stock assignment for reissuance of the shares by the Companies in the name of the trustee. The Voting Trust Agreements also provided that the trustee, John Cody, was entitled to exercise all of the rights, including the right to vote the trust shares and to sell all or part of the trust shares. The Voting Trust Agreements provided for issuance of Trust Certificates to Peggy, as the depositing shareholder, and provided that Peggy, or her successor in interest, shall be entitled to receive dividends or distributions received by the trustee upon the shares represented by the Trust Certificates. Thus, from February 21, 2018 until April 17, 2019, the beneficial owners of the legacy shares were the Voting Trusts (the record owner with voting rights) and Peggy (the Trust Certificate holder, with rights of reversion and the right to receive distributions). Per the shareholders' vote to have the Companies purchase the Voting Trust Shares, the legacy shares held by the Voting Trusts were redeemed by the Companies on April 17, 2019.

Although Ms. Gardiner asserts a claim for valuation of the legacy shares as a naked owner, we agree with the trial court that on the date of her withdrawal, she had no ownership right in the shares. It is worth reiterating that Ms. Gardiner, as a naked owner, does not have a present ownership right in the legacy shares because Peggy, per her husband's Last Will and Testament, is the usufructuary with the right to sell, exchange, or otherwise dispose of the shares until the termination of her usufruct. *See* La.Civ.Code art. 568. Further, the record is devoid of any evidence that the Companies established a procedure under La.R.S. 12:1-723 to permit Ms.

14

Gardiner the opportunity to file a beneficial ownership certificate electing to be treated by the Companies as the record shareholder. After reviewing the statutory provisions, the Voting Trust Agreements, Amendments thereto, the Stock Redemption Agreements, the By-Laws of the Companies, and the Minutes of the Companies Shareholder Meetings, we, too, find that Ms. Gardiner did not have an ownership right in the legacy shares on the date of her withdrawal, July 23, 2018, and that the only claim Ms. Gardiner has is a claim under La.Civ.Code art. 568.1, which provides an action against the usufructuary (Peggy) for an accounting upon termination of the usufruct.

Although Ms. Gardiner argues that the Companies paid less than the fair value for the legacy shares when redeeming Peggy's shares on April 17, 2019, under La.Civ.Code art. 568.1, Peggy is responsible to pay Ms. Gardiner, at the end of the usufruct, the value of the shares at the time of the alienation of the shares and "[i]f, at the time of the alienation, the value of the property received by the usufructuary is less than the value of the thing alienated, the usufructuary (Peggy) is bound to pay the difference to the naked owner (Ms. Gardiner) at the termination of the usufruct."[2] Additionally, as stated in La.Civ.Code art. 628, "[i]f property has been lost or deteriorated through the fault of the usufructuary (Peggy), the owner (Ms. Gardiner) is entitled to the value the property otherwise would have had at the termination of the usufruct."

---

[2] Louisiana Civil Code Article 568.1 states:

> If a thing subject to the usufruct is otherwise alienated by the usufructuary, the usufruct attaches to any money or other property received by the usufructuary. The property received shall be classified as consumable or nonconsumable in accordance with the provisions of this Title, and the usufruct shall be governed by those provisions subject to the terms of the act establishing the original usufruct. If, at the time of the alienation, the value of the property received by the usufructuary is less than the value of the thing alienated, the usufructuary is bound to pay the difference to the naked owner at the termination of the usufruct.

For the reasons stated herein, we hereby affirm the trial court judgment that granted, in part, the Companies' exception of no right of action in regard to the legacy shares that were subject to testamentary legacies of naked ownership in favor of Ms. Gardiner. All costs of this appeal are assessed to Appellant/plaintiff-in-reconvention, Ms. Shawne Gielen Gardiner.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.

SHOP RITE, INC. ET AL.

VERSUS

SHAWNE GIELEN GARDINER

**Pickett, J., dissents and assigns reasons.**

Dan Gielen established three companies (the Companies) during his marriage. He died on February 14, 2018. Prior to his death, he donated a minority interest in the Companies to each of his three children and a grandson. After his death, Peggy Gielen, his wife, became owner of one-half of a majority of the Companies' stock. Pursuant to the terms of Mr. Gielen's will, Mrs. Gielen became usufructuary of the remaining one-half of a majority of the stock in the Companies, the legacy shares, and the Gielens' children and grandson became the naked owners of the other half of th legacy shares. The will granted Mrs. Gielen the right, as usufructuary, to alienate the estate property without the consent of the naked owners.

One week after Mr. Gielen's death, Mrs. Gielen established voting trusts for each of the Companies and transferred the shares she owned and the legacy shares into the voting trusts. Mrs. Gielen named her grandson the trustee of the voting trusts and authorized him to vote the shares deposited into the voting trusts. Pursuant to the voting trust agreements, Mrs. Gielen had the authority to revoke or terminate the voting trusts.

Five months later, in July 2018, Ms. Gardiner notified the Companies of her withdrawal as a minority shareholder in the Companies, asserting oppression as the reason for her withdrawal, as provided in the Louisiana Business Corporation Act. This notice constituted an offer to sell all of her shares in the Companies. La,R.S. 12:1-1435. In September 2018, the Companies responded to Ms. Gardiner's notice. They denied that Gardiner was an oppressed shareholder but accepted her offer to sell her stock. The parties entered negotiations to establish the fair value of Ms. Gardiner's ownership interest in the Companies.

On March 19, 2019, Mrs. Gielen amended the voting trust agreements to authorize the trustee to "exercise all the rights of each Depositing Shareholder" and to "sell all or any portion of the Trust Shares . . . with the express written authorization of the Depositing Shareholder." Then, pursuant to a stock redemption agreement dated April 17, 2019, Mrs. Gielen and the voting trusts sold to and the Companies redeemed outstanding shares held by the Companies that were "subject to a testamentary legacy of naked ownership . . . in favor of" Ms. Gardiner.

The negotiations between Ms. Gardiner and the Companies were unsuccessful, and in October 2019, the Companies filed a petition for declaratory judgment to have the trial court determine the fair value of the shares registered in Ms. Gardiner's name. *See* La.R.S. 12:1-1435. Ms. Gardiner answered the Companies' petition and asserted in a reconventional demand against them that she is record owner of the shares her father donated to her before his death *and* the naked owner of the legacy shares specified in her father's will.

In November 2019, the Companies answered the reconventional demand admitting that Ms. Gardiner is owner of the shares donated to her but denying she

2

had a naked interest in the legacy shares because they had been redeemed by the Companies and now are owned by the Companies. The Companies then filed a peremptory exception of no right of action urging that Ms. Gardiner no longer owned a naked interest in the legacy shares; therefore, she did not have a right to have the trial court determine the fair value of those shares. They asserted that Mrs. Gielen's February 2018 transfer of the legacy shares to the voting trusts transferred ownership of the shares including the naked owners' interests but further assert that full ownership was transferred no later than April 17, 2019, when the Companies redeemed the legacy shares. The Companies further urged that Ms. Gardiner's only recourse for her claim for her legacy shares is against her mother's estate for an accounting as usufructuary upon her death. The trial court and the majority agree with the Companies.

Ms. Gardiner contends that she meets La.R.S. 12:1-140(2)(A)'s definition of beneficial shareholder although the Companies did not issue a separate stock certificate recognizing her as a beneficial shareholder. Section 1-140(2)(A) defines beneficial shareholder to include "a person on whose behalf shares are registered in the name of an intermediary or nominee." Based on this definition, Ms. Gardiner argues that Mrs. Gielen's recognition as beneficial owner after she transferred the legacy shares to the voting trusts in February 2018 did not affect her naked ownership of the legacy shares. She contends that the Companies acknowledged this in their September 2018 letter in which they accepted her "offer to sell for fair value *all interests she may have in shares in the Companies, including without limitation any interests Ms. Gardiner may have as a legatee or heir* in shares comprising part of the estate of John Dan Gielen." (Emphasis added.)

3

In conjunction with her arguments, Ms. Gardiner urges this court to apply the theory of equitable relief provided by judicial estoppel. She notes that in March 2019 Mrs. Gielen amended the voting trust agreements to authorize the trustee to sell "all or any portion of the Trust shares . . . with [her] express written authorization," and one month later, Mrs. Gielen sold Ms. Gardiner's interest in the legacy shares. Continuing, Ms. Gardiner argues, as she did to the trial court, that because the amendment of the voting trust agreements and stock redemptions were not made until eight and nine months, respectively, after she gave written notice of her withdrawal as shareholder of the Companies, this court should apply the equitable doctrine of judicial estoppel and deny the Companies' exception of no right of action. "[J]udicial estoppel [is] an equitable doctrine designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Webb v. Webb*, 18-320 (La. 12/5/18), 263 So.3d 321, 328 (quoting *Miller v. Conagra, Inc.*, 08-21, p. 9 (La. 9/8/08), 991 So.2d 445, 452. Ms. Gardiner further argues that the $1.35 million Mrs. Gielen accepted for the voting trusts redemption of the stock represents only the value of her usufructuary interest in the legacy shares, not the fair value of 100% interest in those shares, which Ms. Gardiner contends is more like $6.6 million.

The Companies counter that Ms. Gardiner's failure or refusal to file reports with the Louisiana State Police and/or State Gaming Board required to renew the Companies' gaming licenses necessitated the redemption. They explain that state regulations prohibit an individual who refused to provide said information from holding directly or indirectly more than a 5% ownership interest, income, or profit interest in a company that holds such license. This explanation is contrary to the

4

Companies' argument that upon Mrs. Gielen's depositing the shares into the voting trusts Ms. Gardiner's naked ownership interest ceased. Indeed, the explanation acknowledges that Ms. Gardiner retained an ownership interest in the legacy shares; otherwise, there was no need for Mrs. Gielen to dispose of Ms. Gardiner's interest in those shares.

Pursuant to La.Civ.Code art. 568, a "usufructuary may not dispose of noncomsumable things unless the right to do so has been expressly granted to him." Louisiana Civil Code Article 568.1 further provides that if a usufructuary alienates "a thing subject to the usufruct . . . the usufruct attaches to any money or other property received by the usufructuary" and that "[t]he property received shall be classified as consumable or nonconsumable in accordance with the provisions of this Title." Thereafter, whether the property received is a consumable or nonconsumable, the usufruct "shall be governed by those provisions subject to the terms of the act establishing the original usufruct." La.Civ.Code. art. 568.1. The Comments -- 2010 to Article 568.1 (emphasis added) explain:

> (a) If the property received by the usufructuary is consumable, then under the provisions of this Title, the usufructuary will be bound to pay to the naked owner at the termination of the usufruct the value of the consumables that he received, and under the regular provisions governing usufruct the usufructuary will become the "owner" of the consumable property. See Civil Code Article 538. *This will leave open the question of whether he may have sold the property for too low a price, and he is always subject to the obligation of acting as a prudent administrator*. See Civil Code Article 576 and revision comment (b). If the usufructuary receives property that is nonconsumable, the usufruct will always attach to it and the usufructuary will be bound to deliver the thing received to the naked owner at the termination of the usufruct. See Civil Code Article 539.

> (b) The provisions expressed in comment (a) are the provisions to which Article 568.1 refers when it states that the usufruct "shall be governed by those provisions." This Article expressly refers to the act establishing the original usufruct, because if that act granted authority to dispose of nonconsumables, that grant would be a continuing grant

5

of authority and would apply to the new nonconsumables that have been received.

Upon establishing the voting trusts in February 2018, Mrs. Gielen exchanged one nonconsumable, the legacy shares, for another, the voting trust shares. La.Civ.Code art. 568.1. Therefore, she still had a duty to act as a prudent administrator, La.Civ.Code art. 538, and remained "bound to use them as a prudent administrator." La.Civ.Code art. 539. Moreover, Ms. Gardiner still had a naked ownership interest in the voting stock shares. *Id.*

In my view, Article 568.1 addresses what happens *after* a transaction. As such, it does not eliminate the duty of a usufructuary of a nonconsumable to act as a prudent administrator when entering a transaction. Furthermore, La.Civ.Code art. 623 allows a naked owner to terminate a usufruct "if the usufructuary commits waste, alienates things without authority, neglects to make ordinary repairs, or abuses his enjoyment in any other manner."

Mrs. Gielen had the duty to act as a prudent administrator when she accepted payment for the legacy shares, and Ms. Gardiner has the right to question whether Mrs. Gielen did in fact act as a prudent administrator in accepting $1.35 million for the redeemed stock. The answer to this question is determinative of whether Ms. Gardiner still has an ownership interest in the stock. If Ms. Gardiner's argument regarding the disparity between the value of the shares and the price Mrs. Gielen accepted is correct, Mrs. Gielen transferred only her usufructuary interest in the shares, and Ms. Gardiner still has a naked ownership interest in the "new" shares. This determination can only be made by allowing Ms. Gardiner to introduce evidence on this issue.

6

In my opinion, the Companies' and Mrs. Gielen's actions *after* the Companies accepted Ms. Gardiner's offer to sell her interests in the legacy shares, coupled with the Companies' inconsistent claims regarding Ms. Gardiner's ownership interest in the Companies and their ability to maintain their gaming licensure, warrant consideration of the merit of Ms. Gardiner's request to apply judicial estoppel. Furthermore, based on Mrs. Gielen's duty as a usufructuary, I believe that Ms. Gardiner has a right of action to have the trial court determine whether the price the Companies paid for her interest in the legacy shares was a fair value. It is especially important to allow a naked owner such as Ms. Gardiner to be afforded this right because unlike publicly-traded stock, the fair value of stock in a closely-held corporation cannot be determined with public information. As a result, if a naked owner is not allowed to question the amount a usufructuary receives in a transaction involving a closely-held corporation, the usufructuary's duty to act as a prudent administrator and to account for imprudent alienations of property after the usufruct terminates serves little, if any, purpose.

For these reasons, I would reverse the trial court's judgment sustaining the Companies' exception of no right of action and remand the matter to the trial court for a trial to determine whether the Companies paid Mrs. Gielen the fair value of the legacy shares.

SHOP RITE, INC., ET AL.

VERSUS

SHAWNE GIELEN GARDINER

**Conery, J., dissents for reasons assigned by Judge Pickett and for additional reasons assigned.**

Decedent John Dan Gielen formed closely held family corporations from which he operated family businesses for many years - Shop Rite, Tobacco Plus and Acadia Wholesale (The Companies). The record shows that Mr. Gielen's daughter, Shawne Gielen Gardner (Shawne), was closely involved with the work of The Companies all of her adult life and eventually became a director and officer of all three. Before his death, Mr. Gielen donated shares in The Companies to Shawne (referred to as the "Prior Shares"), as well as to his other children and grandson, Cody Gielen.

Mr. Gielen passed away on February 14, 2018 and left a last will and testament. Pursuant thereto, Shawne became the naked owner of a designated percentage of stock in The Companies (designated "Legacy Shares"), subject to a usufruct in favor of her mother, Peggy Gielen, Mr. Gielen's surviving spouse.

A week after Mr. Gielen's passing, his grandson, Cody, allegedly succeeded in "convincing Mrs. Peggy" to place all shares of which she was both owner and usufructuary into a "Voting Trust" under Cody's exclusive control. Since there has

been no trial on the merits, the record as to how and why this occurred has not been developed.

On July 23, 2018, a few months later, Shawne sent a "letter of withdrawal" to The Companies on the grounds of "shareholders oppression," offering to sell to The Companies for "fair value" all of her shares in The Companies pursuant to La.R.S. 12:1-1435(C).

On September 21, 2018, The Companies, pursuant to La.R.S. 12.1-1435(E), accepted Shawne's offer to sell **all of her shares** "**including without limitation any interests Ms. Gardner may have as a legatee or heir in shares comprising part of the estate of John Dan Gielen**[.]" (Emphasis added.)

The price to be paid for Shawne's shares was subject to expert evaluation and negotiations, with a court to decide if the parties could not reach agreement on the price per share.

On April 8, 2019, six months later, well after The Companies had accepted Shawne's offer to sell, Cody proposed that The Companies redeem on behalf of The Companies all shares, including Shawne's Legacy Shares. A resolution of The Companies was allegedly adopted allowing Cody to do so at a price allegedly agreed upon by all the remaining shareholders (except Shawne), and with the proceeds payable to Peggy Gielen as usufructuary for all shares over which she had usufruct.

Meanwhile The Companies and Shawne had not been able to reach a decision on the value of Shawne's Prior Shares and The Companies moved forward with their purchase/redemption of Shawne's Prior Shares. By their separate petition filed against Shawne, The Companies asked the trial court to determine the fair value of Shawne's "Prior Shares" she owned before her father's death, as well as the terms by which her Prior Shares would be redeemed by The Companies. Judgment was

2

rendered in that case on November 10, 2020 (15th JDC Docket # 2019-10957-G) and is now on appeal before a different panel of this court. *See Shop Rite, Inc., et al. v. Tobacco Plus, Inc. v. Shawne Gielen Gardiner*, 21-371.

At this point it's important to note that the majority's opinion focuses almost exclusively on Ms. Peggy Gielen's rights as usufructuary under the Civil Code to dispose of Shawne's Legacy Shares subject to the usufruct, subject only to Shawne's right to an accounting from Ms. Peggy's estate after her death. I agree with Judge Pickett's analysis of the usufruct issue and join her dissenting opinion, but would further find that the specific provisions of the Louisiana Law governing corporations should be applied in this case.

Shawne alleged she was an "oppressed shareholder" and as such tendered her shares for redemption to The Companies pursuant to La.R.S. 12:1-1435. That offer was accepted by The Companies. The only thing left to do at that stage was to value Shawne's Prior Shares as well as Shawne's Legacy Shares, and pay that sum to Shawne. As indicated infra, the trial court determined the value of her Prior Shares in a separate trial and that decision is on appeal before a separate panel of this court. The value of Shawne's Legacy Shares must also be decided by the trial court should the parties fail to agree. *See* La.R.S. 12:1-1436.

Instead, on April 8, 2019, some six (6) months after The Companies accepted Shawne's offer to sell **all her shares**, including her Legacy Shares, Cody initiated a proposal to the remaining shareholders to have The Companies redeem all shares in a shareholder's "agreement" that allegedly valued the shares at a very low price, payable ten (10%) cash, with the balance to be paid in 180 months. All voting shareholders approved except Shawne.

3

This is an important case involving the rights of a minority shareholder and hence should be decided based on the specific requirements of Louisiana's Corporate law that provide for the rights of an allegedly "oppressed shareholder." The Companies have denied that Shawne is an "oppressed shareholder," but in this case, the trial court is not required to determine whether Shawne was an "oppressed shareholder" since The Companies specifically accepted her offer to sell **all her shares** to The Companies, both her Prior Shares and her Legacy Shares. The Companies accepted the offer subject only to price negotiations or eventual resolution by the trial court pursuant to La.R.S. 12:1-1436, which provides in pertinent part:

**§ 1-1436. Judicial determination of fair value and payment terms for withdrawing shareholder's shares**

A. (1) If a shareholder's right to withdraw from a corporation is recognized by means of a notice of acceptance under R.S. 12:1-1435(E), but the notice does not create a contract under R.S. 12:1-1435(F), the corporation and shareholder shall have sixty days from the effective date of the notice of acceptance to negotiate the fair value of the shareholder's shares and the terms under which the corporation is to purchase the shares. Within one year after the expiration of the sixty-day period, either party may file an action against the other to determine the fair value of the shares and the terms for the purchase of the shares. Venue for the action lies in the district court of the parish where the corporation's principal office or, if none in this state, where its registered office is located.

. . . .

C. The court **shall conduct the trial of the action** under Subsection A of this Section or the motion under Subsection B of this Section by summary proceeding.

D. Except as provided in Subsection E of this Section, at the conclusion of the trial the court shall render final judgment as described in Paragraphs (1) and (2) of this Subsection:

(1) In favor of the shareholder and against the corporation for the fair value of the shareholder's shares.

4

(2) In favor of the corporation and against the shareholder that does both of the following:

(a) Terminates the shareholder's ownership of shares in the corporation.

(b) Orders the shareholder to deliver to the corporation within thirty days of the date of the judgment any certificate issued by the corporation for the shares or an affidavit by the shareholder that the certificate has been lost, stolen, destroyed, or previously delivered to the corporation.

(Emphasis added.)

Citing The Companies' acceptance of her withdrawal, Shawne accurately argues that the theory of judicial estoppel operated to preclude The Companies from attempting to "frustrate" her right to proceed under La.R.S. 12:1-1436 via its exception of no right of action.

The Louisiana Supreme Court has explained that "'judicial estoppel [is] an equitable doctrine designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Webb v. Webb*, 18-0320, p. 9 (La. 12/5/18), 263 So.3d 321, 328 (quoting *Miller v. Conagra, Inc.*, 08-0021, p. 9 (La. 9/8/08), 991 So.2d 445, 452).

Although its equitable nature precludes the reduction of equitable estoppel to a precise formula or test, the United States Supreme Court has noted that several factors typically inform a court's decision on its application as follows:

First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position .... A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Zedner v. U.S.*, 547 U.S. 489, 504, 126 S.Ct. 1976, 1987 (2006) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51, 121 S.Ct. 1808, 1815). .

5

"The purpose of the doctrine is to protect the integrity of the judicial process, by preventing the parties from playing fast and loose with the courts to suit the exigencies of self-interest." *Thomas v. Economy Premier Assur. Co.*, 50,638, p. 5 (La.App. 2 Cir. 5/18/16), 196 So.3d 7, 11 (citing *In re Coastal Plains, Inc.*, 179 F.3d 197 (5th Cir. 1999), *cert. denied*, 528 U.S. 1117, 120 S.Ct. 936 (2000); *In re Superior Crewboats, Inc.*, 374 F.3d 330 (5th Cir. 2004); *Jethroe v. Omnova Sols., Inc.*, 412 F.3d 598 (5th Cir. 2005)), *writ denied*, 16-1169, 16-1177 (La. 10/28/16), 208 So.3d 377, 378.

Noting its "equitable" nature, the Louisiana Supreme Court explained in *Webb* that the doctrine of estoppel is invoked at the court's discretion given the specific factual context before it, including any harm that may be posed to third parties. *Webb*, 263 So.3d 321.

Shawne maintains that a balancing of such factors in this case requires the application of the discretionary doctrine upon consideration of "the significant risk to third parties if [The Companies] are not estopped, as well as the familial and fiduciary relationships shared by the parties and the endangered third parties." She contends that the trial court, in sustaining the exception of no right of action, allowed The Companies to attempt to manipulate the judicial system and "compounded" the harm not only to herself, but to "Mrs. Peggy, and the Gielen family" as well. As an example, Shawne explains that had the same per share value used at the trial on the merits of her Prior Shares in 15th JDC Docket # 2019-0957-G, she would have been able to demonstrate that "Mrs. Peggy should have received $6,600,032.85 for the full ownership, including the usufructuary and naked ownership interests, in the Legacy shares." The Companies, however, "only paid Mrs. Peggy $1,350,314, well

6

below the fair value of the Legacy Shares." Such tactics should not be countenanced, Shawne argues.

I find merit in this position. Certainly, Shawne offers a compelling argument regarding the stark difference in the amount paid to Ms. Peggy and the "value" found by the trial court in its evaluation of Shawne's Prior Shares. However, the trial court decided the separate issue of the value of Shawne's Legacy Shares on an exception of no right of action, which offers no opportunity for the type of evidentiary hearing mandated by La.R.S. 12:1-1436. As indicated above, an appeal of the judgment resulting from the valuation of Shawne's Prior Shares is pending before a different panel of this court. *See Shop Rite, Inc., et al. v. Tobacco Plus, Inc. v. Shawne Gielen Gardiner*, 21-371.

Clearly, Shawne has alleged, and the record supports, that The Companies have already accepted her offer to sell all of her shares, including her Legacy Shares, subject only to valuation of her shares as well as the valuation of Peggy Gielen's usufruct. I would remand this case to the trial court to do so. Hence, I would reverse the trial judge and issue a remand for the trial court to determine the value of Shawne's Legacy Shares. The eventual value must take into account the value of Peggy Gielen's usufruct over Shawne's Legacy Shares.